Northwest Telephone Co. v. Commissioner.
Northwest Tel. Co. v. Commissioner
Docket No. 108319.
United States Tax Court
1944 Tax Ct. Memo LEXIS 255; 3 T.C.M. (CCH) 454; T.C.M. (RIA) 44155; May 15, 1944
*255 S. J. Bischoff, Esq., and Robert T. Jacob, Esq., 917 Public Service Bldg., Portland. Ore., for the petitioner. E. A. Tonjes, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in income tax and excess profits tax for the year 1937 in the respective amounts of $371.75 and $244.69. Petitioner concedes one adjustment which respondent made. The only adjustment contested is the disallowance of $1,981.81 for depreciation. The only question in issue is the basis to petitioner of its properties for purposes of computing allowance for depreciation. Petitioner filed its return for the year 1937 with the collector for the district of Oregon. Findings of Fact 1. Petitioner, an Oregon corporation, was incorporated April 10, 1929. Its principal office is at Hillsboro, Oregon. Its business is the operation of a public telephone service business in the states of Oregon and Washington. 2. Petitioner's authorized capital stock consists of 500 shares of common stock having a par value of $100 per share, and 500 shares of preferred stock. The preferred stock has never been issued. All of the common stock is issued and outstanding. *256 Petitioner also has issued bonds in the principal amount of $80,000. The common stock and bonds were issued shortly after petitioner was organized under circumstances set forth hereinafter. 3. The Sheridan-Willamina Telephone Co., an Oregon corporation, maintained telephone exchanges at Sheridan and Willamina, Oregon. It maintained toll lines throughout Yamhill and Polk counties, Oregon. Charles E. Wells and G. W. Wells were president and secretary of Sheridan-Willamina. The total outstanding stock of this company, hereinafter called S-W, was 5,000 shares. In 1929, Charles E. Wells owned at least 4,050 shares. 4. The Deschutes Mutual Telephone Company, an Oregon co-operative association, maintained an exchange at Redmond, Oregon. It maintained toll lines throughout Deschutes and Crook counties, Oregon. In 1929, Charles E. Wells and William G. Hare were president and secretary of Deschutes Mutual. The total outstanding stock of this company comprised 84 shares. In 1929, Charles E. Wells and William G. Hare owned 82 shares of Deschutes stock. They also owned the real property and building in Redmond, Oregon, in which the exchange was located. They had purchased this from an individual *257 owner. The total cost of the stock and property was $39,680.94, of which Wells contributed $33,036.66, and Hare contributed $6,644.28. Of the total sum, $39,680.94, the sum of about $5,000 was the price paid for the telephone exchange building and real estate, so that about $34,680.94 was the price paid for the stock. The above stock and property were purchased by Wells and Hare in September of 1928. 5. In August of 1928, Earl W. Gates purchased all of the physical properties of a telephone company called the Skamania Cooperative Telephone Association of the State of Washington for the total sum of $11,909.37. All of these properties were located in Stevenson and Skamania counties in the State of Washington. All of these properties were deeded to Gates on August 8, 1928. 6. In the early part of 1929, Wells owned stock in two other telephone companies, Yamhill County Mutual Telephone Company and Dayton Telephone Company, to the extent of about 47 shares, altogether. Such number of shares represented minority holdings in these companies. [1]
*258 7. Gates contemplated the purchase of the properties of Skamania in May of 1928 when he paid consideration for an option on the property. After he acquired the option he discussed with Wells the possibility of purchasing some other telephone companies and consolidating all of them into one company. In August the matter was discussed with Hare who was closely associated with Wells. Hare is an attorney. Gates and Wells had been engaged in owning and operating telephone companies for many years. A tentative plan was made to organize petitioner. It was contemplated that the operating properties which petitioner would eventually acquire and operate would be the properties formerly owned by the Skamania Association and the properties owned by S-W and Deschutes. Before any definite plan was agreed upon, however, Wells, Gates, and Hare engaged a telephone engineer, W. W. Hardinger, to make an appraisal of each of the three groups of physical properties, exclusive of the properties owned by the Yamhill and Dayton companies. After Hardinger's appraisal was made, i.e., in the spring of 1929, a final agreement was made to organize petitioner. 8. Hardinger's appraisal was made as of December *259 31, 1928. It was completed in January of 1929. He used a method of valuation known as estimated cost of reproduction of the properties. His appraisal reported two values for each group of properties, "Cost New" and "Cost Less Depreciation." His report upon each group of properties was as follows: Cost
Less De-
New
preciation
Skamania properties
$36,176
$32,095
Deschutes properties
91,718
83,586
Sheridan-Willamina prop-
erties
96,646
84,174
Total
$224,540
$199.855
9. Gates believed that the fair market value of all of the above properties was not more than $130,000. That sum was agreed upon by Wells, Gates, and Hare as a basic amount, and when petitioner was organized, or shortly after, after all steps in the transaction were completed, petitioner issued securities in the principal amount of $130,000, consisting of $50,000 par value common stock and $80,000 principal amount bonds. Also, when accounts were set up on petitioner's books under the date of June 1, 1929, the book values of net assets totaled $130,000 against bonds and capital stock of $130,000 as follows: Charges
Credits
June 1, 1929 - Undistributed cost
of properties
$130,000
First Mortgage bonds
$80,000
Common capital stock
$50,000
*260 10. It was agreed originally that the interests of the three organizers in petitioner should be as follows: Wells should have a 50 percent interest; Gates and Hare should each have a 25 percent interest. A subsequent adjustment in these interests was made after all of the transaction was completed. However, originally, the common capital stock of petitioner was issued, on April 25, 1929, 250 shares to Wells, and 125 shares each to Gates and Hare. 11. The above stock was issued under the following circumstances in exchange for property owned by each person as follows: (a) A meeting of the board of directors of petitioner was held on April 25, 1929. At this meeting Wells, Gates, and Hare reported that they owned the following property: 1. 4,050 shares of stock of the Sheridan-Willamina Co. 2. 75 [2] shares of stock of the Deschutes Mutual Telephone Co. 3. 7 shares of stock of the Yamhill County Mutual Telephone Co. 4. 37 shares of stock of the Dayton Telephone Co. 5. All of the physical properties *261 formerly owned by the Skamania Co-operative Telephone Association. 6. Lot 3, Block 26, in Redmond, Deschutes County, Oregon, (the property where the exchange of the Deschutes Company is located). They reported, also, that all the above properties were "reasonably and fairly worth the sum of $130,000." They offered to transfer all of the above property, stock, real estate, and physical properties to petitioner in exchange for 500 shares of the common capital stock of petitioner of a par value of $50,000, for which stock they had subscribed, and for bonds of petitioner in the principal amount of $80,000, to be issued later and delivered to them, the bonds to be 6 percent, 20-year bonds, secured by a deed of trust on all of the properties of petitioner. They stated that Wells owned 50 percent of the above property to be conveyed to petitioner, and that Gates and Wells owned 25 percent, each, of the property, and that was agreed. The directors "agreed" that all of the above properties had a "fair and reasonable and actual value of $130,000"; and that the bonds to be issued in the suggested amount of $80,000, together with the amount of the stock subscriptions, $50,000, "represent the *262 actual value of the said properties to be turned over to the corporation". The directors adopted a resolution stating that the offer of Wells, Gates, and Hare was accepted to receive the above described properties and stocks, in full payment of the subscriptions to 500 shares of petitioner's common stock, and that "in addition thereto and as balance payment for said properties", the petitioner should execute and deliver to a trustee a deed of trust covering all of the properties of the petitioner and securing an issue of 6 percent bonds payable in 20 years in the total principal amount of $80,000; and that petitioner should issue and deliver $40,000 of the bonds to Wells, and $20,000 of the bonds to Gates, and $20,000 of the bonds to Hare; that upon conveyance of the above described properties and stocks to petitioner, petitioner should issue its common stock, 250 shares to Wells, 125 shares to Gates, and 125 shares to Hare, as fully paid and non-assessable stock; and that it was understood that "it is the purpose of the Corporation before the issuance of said bonds to make purchase of the physical properties of each of the Corporations herebefore named, and that said physical properties *263 be covered by the Deed of Trust". Although the resolution as quoted above referred to "Corporations herebefore named", which literally refers to four corporations, to wit, S-W, Deschutes, Yamhill, and Dayton, such was not intended. It was intended, at least for the then immediate present, to have the deed of trust cover only the properties of S-W and Deschutes, and the physical properties formerly owned by Skamania. The operating properties of petitioner were to comprise the properties formerly owned by those three companies only. Petitioner was to purchase the physical properties of S-W and Deschutes from those companies. The stock in Yamhill and Dayton which petitioner was to acquire from the organizers of petitioner was a small part of the outstanding stock of each company. If petitioner was to purchase, later, the property of Yamhill and Dayton, such fact is not shown in this proceeding. (b) Thereafter, on April 25, 1929, certificates of stock were issued to Wells, Gates, and Hare in the respective numbers of shares agreed. (c) The stocks described above were transferred to petitioner, and, under a deed dated March 27, 1929, Gates and his wife conveyed the Skamania properties *264 to petitioners. 12. After due authorization pursuant to a resolution adopted at a director's meeting held on May 6, 1929, petitioner made offers to purchase the business, franchises, and properties of S-W and Deschutes for the respective prices of $12,700 and $14,006. Special meetings of the stockholders of S-W and Deschutes were held on May 20, 1929, and May 22, 1929, respectively. At the meeting of the stockholders of S-W, there were present stockholders owning 4,870 shares of a total of 5,000 shares of issued stock; and at the meeting of the stockholders of Deschutes, there were present stockholders owning 82 shares of a total of 84 shares of issued stock. The above offers were accepted at the offered purchase prices by duly adopted resolutions. The stockholders of Deschutes voted to dissolve the company and Charles E. Wells, Theodore J. Wells, and Cassie Wells were appointed trustees to "wind up" the affairs of the company. The stockholders of S-W adopted a resolution to settle its affairs and dissolve the corporation. The respective properties of S-W and Deschutes were conveyed to petitioner by deeds dated May 20, 1929, and May 27, 1929. The two companies were not dissolved *265 immediately because of some problem in locating the minority stockholders. 13. There was no payment of cash consideration for the physical properties made by petitioner direct to the S-W and Deschutes companies because petitioner was the chief stockholder of the companies and, in the end, upon formal liquidation, such payments would have been returned to petitioner. Besides, at the time, petitioner did not have cash to pay for the above properties. To avoid taking the formal steps of making a payment of the purchase price, a short-cut procedure was followed which was to take care of the holders of 2 shares of Deschutes stock owned by outsiders and 950 shares of S-W stock. It was contemplated that petitioner would purchase the stock of the minority stockholders at the book values of the stock, and a reserve was set up on petitioner's books for that purpose. The purchase price of the properties, $12,700 and $14,006. was arrived at by finding the book values of the stocks of S-W and Deschutes. That is, according to the book values, the 5,000 shares of S-W stock had a book value of $12,700, and the 84 shares of Deschutes had a book value of $14,006. The arrangement to purchase the properties *266 at these figures was for the purpose of acquiring the stock of the minority stockholders at the book values of the stock. If there had been a straight liquidation of both companies, distributing the assets of each to the stockholders, it would have been necessary to issue some of petitioner's stocks and bonds to the minority stockholders of both companies in exchange for their stock in the original companies, and petitioner's stockholders desired to avoid that result. In order to avoid that result, the procedure adopted was to purchase the physical properties of each company at a price equal to the book values of the total outstanding stock of each company. Since petitioner was in control, this plan could be carried out. 14. At a meeting of petitioner's directors on June 12, 1929, petitioner's president reported: "* * * that pursuant to authority in him vested, he had made purchase for and in behalf of this Corporation, of the business, franchises and property as a whole of the Deschutes Mutual Telephone Company, a co-operative association, at and for the price of $14,000.00 and of the business, franchises and property as a whole of the Sheridan-Williamina Telephone Company, an *267 Oregon corporation. at and for of $12,700.00, and have received proper conveyances therefor and have completed said purchases." Also, at the same meeting, the issuance of $80,000 of bonds was authorized to be issued; $40,000 to Wells, and $20,000 to Gates and Hare, each. 15. The book entries on petitioner's books, which were made as of June 1, 1929, set up the three telephone systems known as Skamania, S-W, and Deschutes at a total value of $122,740.59, and, the current assets and liabilities of Skamania, S-W, and Deschutes, all of which companies were going concerns, were taken over and assumed by petitioner in a total net amount of $2,686.08, making a total of $125,426.67, as the value of the 3 groups of properties and business enterprises. The difference between that figure and $130,000, which is $4,573.33, represents a net figure called on the books "undistributed cost of properties", made up as follows: Item
Charges
Credits
Dayton Telephone Co. stock
$3,360.00
Wm. G. Hare - acct. r.
1,630.00
J. E. Proffett - acct. r.
210.00
Organization - expense
409.69
Due to stockholders of acquired companies: S-W Telephone Co.
$1,000.00
Deschutes
36.36
Undistributed cost of properties
4,573.33
$5,609.69
$5,609.69
*268 16. The entries on petitioner's books to carry over the current assets and liabilities of Skamania, S-W, and Deschutes show the following totals: Current Assets Taken Over
Skamania
S-W
Deschutes
Cash, bills receivable, accts. receivable, materials & sup-
plies, prepayments
$1,223.11
$3,225.84
$5,365.91
Liabilities Assumed
Skamania
S-W
Deschutes
Accounts payable, notes payable, accrued liabilities
$1,350.98
$3,305.48
$2,472.32
The liabilities of Skamania exceeded current assets by $127.87; the liabilities of S-W exceeded current assets by $79.64, (total $207.51); the current assets of Deschutes exceeded its liabilities by $2,893.59; the combined current assets exceeded the combined current liabilities by the net amount of $2,686.08, That amount was carried on the books as "undistributed cost of properties." 17. The opening entries on petitioner's books under the date of June 1, 1929, carried all the properties at a total sum of $122,740.59 which was allocated as follows: Redmond building
$ 3,399.91
Land
2,049.86
Plant
117,290.82
Total
$122,740.59
18. Prior to the organization of petitioner, Wells, Gates, and Hare discussed the *269 matter of the interest which each would have in petitioner. It was agreed that Wells would have a 50 percent interest, and Gates and Hare would have 25 percent interests. However, on the basis of cash expenditures, in most instances, the contribution of each person to the pool of stocks and properties to be conveyed to petitioner was not in the proportions of one-half and one-quarter, respectively, as the following summary shows: Wells
Cash spent for 82 shares Deschutes
stock and real estate in Redmond
location of exchange
$33,036.66
S-W stock, 4,050 shares
24,000.00 [3]
Cash to be advanced to petitioner
for working capital
1,409.69
$58,546.35
Gates
Cash paid for Skamania properties
11,909.37
Hare
Cash paid to purchase Deschutes
stock and property
$6,644.28
The three persons treated all the above amounts as "costs" of the stocks, properties, and cash to go to petitioner. *270 The amounts total $77,000, [4] and 1/2, 1/4, and 1/4 of such total amount is $38,500, $19,250, and $19,250. However, Wells' contributions exceeded $38,500 by $19,946.35, and Gates' and Hare's contributions were less than $19,250 each, to the extent of $7,340.63 and $12,605.72. In order to bring about the desired proportionate interests in petitioner's stock, Gates and Hare agreed to pay Wells, in cash, $7,340.63 and $12,605.72. No such payments were made to Wells prior to the organization of petitioner and prior to the transfer to petitioner of the stocks and properties. After petitioner had been organized and had acquired the above properties, *271 Gates paid the agreed amount in cash to Wells, but Hare was unable to pay all of his amount. He paid about one-half and transferred to Wells one-half of the stock in petitioner which he had received in April of 1929. In the end, after the inter se cash adjustments were made between the three persons, Wells owned 312 1/2 shares of petitioner's stock, 62 1/2 percent; Gates owned 125 shares, 25 percent; and Hare owned 62 1/2 shares, 12 1/2 percent. None of the cash paid by the individuals to each other in these adjustments was received by petitioner. [5]
19. Petitioner, in its return, deducted the amount of $4,723.72 for depreciation on the three groups of properties for the year 1937. Respondent allowed the amount of $2,741.91 for depreciation and disallowed $1,981.81. The explanation given for this adjustment is as follows: "In your return you reported that you were organized on March 29, 1929, and that your business is not the outgrowth, result, continuation or reorganization of a business or businesses in existence *272 prior thereto. The records of this office show, however, that you were organized for the purpose of acquiring certain properties then in use in providing telephone service for communities located in Skamania County, Washington, and Deschutes and Yamhill Counties, Oregon, and that you did acquire and have at all times thereafter operated such properties. The Bureau holds that these properties were acquired in tax free exchanges and that your basis for computint depreciation is limited to the basis in the hands of the predecessor operating entitles. Computation of depreciation on that basis results in an allowance of $2,741.91, in lieu of $4,723.72 deducted on your return. Taxable income reported has, therefore, been increased by the difference between these sums, or $1,981.81. * * *" 20. The sum of $4,723.72 deducted by petitioner as depreciation on plant and equipment in its return for the year 1937 was computed by petitioner as follows: Plant Account
$108,066.62
Less Land
$2,248.62
Less Intangible
350.00
Less Autos
3,150.03
5,748.65
Balance
$102,317.97
The depreciation of $4,723.72 deducted in the return for 1937 consists of the following: Autos $ 3,150.03 at 20 percent
$ 630.00
Plant $102,317.97 at 4 percent
4,093.72
Total depreciation deducted
$4,723.72
*273 21. The sum of $108,066.62 used by petitioner as the basis for computing the depreciation claimed by it for the year 1937, as set forth in paragraph 20 above, resulted, in part, from the use of the book figure for the old plant and land acquired by it in the year 1929 of $122,740.59. The latter sum consists of the following: Plant and Land
$122,740.59
Less Land
$2,049.86
Less Building
3,399.91
5,449.77
Balance (book figure) allocated
to old plant
$117,290.82
22. The Commissioner eliminated from the 1929 basis of $117,290.82, claimed by the petitioner, the sum of $69,616.20 which the Commissioner determined to be appreciation of assets as of May 31, 1929, (stepped-up basis). As a result, the Commissioner determined the 1929 cost of the old plant to petitioner to be $47,674.62, which was the cost to the prior operating entities. The Commissioner deducted from the $47,674.62 depreciation accrued to May 31, 1929, amounting to $16,108.90, which left an undepreciated cost at May 31, 1929, of $31,565.72. 23. In determining the deficiency asserted for the taxable year 1937, which is involved in this proceeding, no depreciation for 1937 was allowed by the Commissioner *274 with respect to the aforesaid basis of $47,674.62 determined by him for the old plant, for the reason that he determined said basis had been completely exhausted by depreciation, retirements and sales in years prior to 1937. The following represents the depreciation taken and the retirements and sales with respect to the old plant for years prior to 1937: Depreciation deducted prior to May
31, 1929
$16,108.90
Depreciation deducted June 1, 1929 to
December 31, 1935
18,785.10
Retirements 1936 and prior years
5,181.53
Sales of assets in 1931
12,786.62
Total depreciation, retirements
and sales prior to 1937
$52,862.15
24. The sum of $108,066.62 which petitioner used as the 1937 basis for computing depreciation on its properties was reduced by the Commissioner in the sum of $44,338.27 determined by him to represent the remaining appreciation (stepped-up basis) for the old plant, resulting in a 1937 basis for its said properties as determined by the Commissioner of $63,728.35. The latter sum consists of the following items, and the depreciation allowed by the Commissioner with respect thereto is as indicated: Depre-
ciation
Properties
Basis
Allowed
Redmond Building
$ 4,235.48
$ 128.20
New Plant
25,945.00
1,291.61
Reconstruction
33,547.87 *
1,322.10
Totals
$63,728.35
$2,741.91
*275 25. Petitioner purchased the properties of Sheridan-Williamina Co. and of Deschutes Mutual Company, respectively, for $12,700 and $14,006. Petitioner acquired the Skamania properties from Gates in exchange for its securities on April 25, 1929, on which date the fair market value of the properties was not more than $11,909.37. The fair market value of the securities on that date, which were given in exchange, was $11,909.37. 26. Wells, Gates and Hare drew up a schedule on March 20, 1929, entitled "Statement of Costs Incurred in Purchase of Properties of Northwest Telephone Co." which each signed. The statement shows, as follows, among other things: 82 shares of stock of Deschutes Mutual
Telephone Co.
$39,680.94
Purchase of physical properties of Ska-
mania Co. Cooperative Co.
11,909.37
Purchase of 4,050 shares of Sheridan-
Williamina Tel. Co.
24,000.00
Working capital
1,409.69
Total
$77,000.00
*276 Gates turned over the Skamania properties to petitioner on the basis of the price he had paid for them. Opinion Memorandum Findings of Fact and Opinion and decision were entered in this proceeding on August 17, 1943, and August 18, 1943, respectively. Petitioner filed a motion on September 13, 1943, to vacate the decision and asking for revision of the Findings of Fact and Opinion. The motion was granted, and by separate order dated November 8, 1943, the Memorandum Findings of Fact and Opinion and decision were vacated and set aside. That action was necessary in view of new facts submitted by stipulation of the parties on November 5, 1943. The facts stipulated on November 5, 1943, have been incorporated into the Findings of Fact in this report. The parties have filed supplemental briefs. The issue has been given further consideration. The parties are not in disagreement over the depreciation allowed by the respondent in the amount of $2,741.91. As is shown in paragraph 24 of the Findings of Fact, that allowance is for depreciation on new plant, reconstruction, and the Redmond building. It does not appear that petitioner or respondent are in any disagreement on the amount of the *277 basis for those properties in the amount of $63,728.35. However that may be, there is no issue under the pleadings in this proceeding relating to the basis of such properties. The parties are in disagreement on the point of whether petitioner was entitled to an allowance for depreciation in 1937, the taxable year, on the old plant, namely, the properties formerly operated by companies known as Skamania, Sheridan-Willamina Co., and Deschutes Mutual Co. Petitioner acquired the properties formerly owned by those companies in 1929, and they are referred to hereinafter as the 1929 properties. Respondent did not allow any depreciation on the 1929 properties for the year 1937 for the reason that he determined that the basis of those properties had been completely exhausted by depreciation, retirements, and sales during years prior to 1937. That determination of the respondent followed from his further determination that the basis to petitioner of the 1929 properties was $47,674.62. That figure, respondent says, was the cost of the 1929 properties to the predecessor operating entities. The question is whether or not petitioner is entitled to any deduction for depreciation in 1937, the taxable *278 year. Through depreciation deductions through the year 1935, and retirements and sales of assets, $52,862.15 of the basis of the properties, whatever it is, has been absorbed. The question turns upon our determination of the basis to petitioner of the properties. Petitioner claims that the basis of the properties is cost to petitioner in the amount of $130,000. Respondent has determined that the basis to petitioner is $47,674.62, which he contends was the basis of the properties in the hands of the predecessor operating entities. Respondent contends first that all of the depreciable properties were acquired by petitioner in exchange for its stock or securities in connection with a transaction described in section 112 (b) (5) of the Revenue Act of 1928, so that, under section 113 (a) (8) the basis to petitioner shall be the same as it would be in the hands of the transferror; or, that all of the properties were acquired in a reorganization, as defined in section 112 (i) (B), so that under section 113 (a) (7) the basis to petitioner is the same as it was in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon *279 the transfer, etc. See section 114 (a) of the Revenue Act of 1928, which provides that the basis for depreciation of property shall be the same as provided in section 113 for purposes of determining gain or loss. Respondent asserts that the transactions under which petitioner acquired the properties may be placed under either or both of the statutory provisions referred to above. He relies upon , certiorari denied, ; ; affd., , certiorari denied, . Petitioner argues that the properties were not acquired in a transaction which was either a tax-free exchange or a reorganization where control of the property remained in the same persons, within the scope of the statutory provisions to which respondent refers. Petitioner contends that it acquired the properties in question by purchase and that, consequently, the basis is cost to petitioner. Petitioner argues that the question should be considered in exactly the way that *280 the organizers of petitioner laid out their plan. Petitioner emphasizes that it "had to purchase from the two corporation (not Gates, Hare, and Wells) in order to acquire title" to the properties owned by Sheridan-Willamina and Deschutes, but elsewhere petitioner asserts that it gave its stock and bonds in payment for the S-W and Deschutes properties as well as for the Skamania properties, and that, consequently, the "cost" of all of the 1929 properties to petitioner is the reasonable value of the stock and bonds issued in payment. Obviously, there is some confusion in petitioner's argument at this point, in its disregard of the transactions between petitioner and the two companies under which petitioner was authorized to purchase their assets for $12,700 and $14,006. Finally, petitioner contends that the physical properties had a value of $130,000, "which constitutes the value of the stock and bonds issued by it," the value of the stock and bonds so issued being determined by the value of the physical property acquired. . Careful consideration has been given to the arguments of the parties presented in their *281 respective original and supplemental briefs. Under the facts we believe the issue should be determined by giving full effect to the steps which were taken, and that petitioner should not now assert that the properties were acquired under arrangements other than those which it adopted. The problem is to establish the basis of three groups of properties for purposes of depreciation allowance. That is the issue presented in its broad aspect. The reasons or theories adopted by the respondent originally, whatever they were, do not frame the issue. The issue is only, what is the basis to petitioner for the properties for purposes of depreciation. We believe there is considerable merit in respondent's arguments but the question can be determined without resort to such difficult theories as respondent presents. Petitioner gave its securities to Gates in exchange for the physical assets of Skamania. It gave its securities to Wells and Hare in exchange for the majority of the stock of S-W and Deschutes. Petitioner did not acquire the assets of S-W and Deschutes in exchange for its stock and bonds. Later it acquired the assests of those two companies by purchase for cash. The transferor of *282 the Skamania property was Gates. The transferors of the physical properties of S-W and Deschutes were those companies. Although Wells and Hare were the majority stockholders of those companies, there were minority stockholders and they did not at any time receive any of petitioner's stock and bonds. Presumably those minority stockholders received cash for their interests in the companies. These facts are important, and we think they are determinative. It is held that petitioner purchased the Skamania properties from Gates, and purchased the other properties from the S-W Company and the Deschutes Company. The price in the purchase from S-W was $12,700, and in the purchase from Deschutes, the price was $14,006. Accordingly, the cost to petitioner of those properties was $26,706, and that is the basis to petitioner for depreciation purposes. See sections 114 (a) and 113 (a). Gates received stock and bonds of petitioner in exchange for the Skamania properties. He had recently purchased the properties and he contributed them to petitioner on the basis of the price he had paid for them. The cost to petitioner of these properties is the fair market value on the date of issuance of the securities *283 given by petitioner in exchange for them, and such fair market value on that date may properly be determined to be the equivalent of the fair market value of the property received. ;; affd., . The fair market value of the Skamania properties on April 25, 1929, was $11,909.37. That is the amount paid by Gates for the properties in an arms-length transaction in August of 1928. There is testimony by one of petitioner's witnesses that the values of telephone properties do not change very much. There is no evidence to show that the Skamania properties had any greater value on April 25, 1929. Sales price in an arms-length transaction is the best evidence of fair market value. Paul & Mertens, Law of Federal Income Taxation, Vol. 5, p. 720, par. 52.10. . Gates did not give testimony on his opinion of the value of the separate Skamania properties. There is no evidence to explain the value given to the separate properties on petitioner's *284 books in the amount of $19,244.47, which represented an increase of $7,335 above the price paid by Gates. Under all of the evidence, it has been found as a fact that the fair market value of the Skamania properties on April 25, 1929, did not exceed $11,909.37. The total cost of all of the 1929 properties to petitioner was $38,615.37, which represents the basis of the properties for depreciation purposes. Prior to 1937 the cost to petitioner was exhausted by depreciation allowances, retirements and sales. Respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
1. The record is incomplete and inconsistent on the point of the total number of shares of stock in these two companies. In one exhibit the number of shares in both companies is said to be 47 shares; in another exhibit it is stated that 7 shares of stock of Yamhill and 37 shares of stock of Dayton were held by the three individuals prior to the organization of petitioner. There is little testimony on this point.↩
2. Wells and Hare had purchased 82 shares of the Deschutes stock but had not received the assignments to all of the shares. At some later date, all of these shares were transferred.↩
3. Wells treated the 4,050 shares of S-W stock as having a value in April 1929, of $24,000. In 1934, Wells executed a sworn statement that he had paid $18,700 for this stock but that he and Gates had agreed that the stock had a value of $24,000 at the time petitioner was organized.↩
4. Added to this is the cost of the Yamhill and Dayton stock of $4,200, which stock it appears, was to go to petitioner. The record is not clear on these stocks, and, for convenience, they are not discussed above. However, the plan was that adjustments were to be made between the parties to take into account these stocks, and that the interests of the individuals in these stocks was to be 50 percent, 25 percent, and 25 percent, and that cash was to be paid by Gates and Hare to Wells to adjust the respective interests to such proportions.↩
5. The record does not show whether Hare transferred to Wells one-half of the bonds of petitioner which he received originally. The presumption is that he did.↩
*. The total reconstruction account through 1936 appearing in "Exhibit A-3" attached to the deficiency notice amounts to $28,699.06. During the year 1937 additions were made amounting to $4,848.81 on which no depreciation was allowed for that year. The sum of the foregoing aggregates $33,547.87, representing the reconstruction account for the year 1937.↩